Good morning. Good morning. You may proceed. Thank you. Good morning to Judge Gregory, Judge Wilkinson, and Judge Keenan. And may it please the court, I'm Theodore A. Howard on behalf of the appellants and subject to such questions or concerns as the court may have, I will address three questions. First, whether the district court erred in concluding that its evaluation of appellants claimed that they were denied adequate mental health care in detention at Shenandoah Valley Juvenile Center should be governed by a deliberate and different substantive standard rather than a professional judgment standard as articulated in Youngberg v. Romeo. Second, whether the district court, if the district court did err in failing to apply the professional judgment standard, whether trauma-informed care constitutes the consensus standard of care among professionals in the field of treating mental health children, mentally ill children in a juvenile detention setting by which the judgment reflected by Shenandoah's treatment should be evaluated. And third, and arguably most critically, whether even assuming that the district court correctly applied the deliberate and different standard rather than professional judgment, summary judgment in favor of Shenandoah on the inadequate mental health care claim was nevertheless improperly granted in light of the facts of record viewed in the light most favorable to Plaintiff John Doe IV and with all reasonable inferences from those facts drawn in his favor. Regarding the governing standard, the parties generally agree that the fact-specific functional analysis articulated by this court in the Patton case is determinative, considering both the basis and rationale for the detention and the nature of the detention facility. Let me ask you a preliminary question. Under the cooperative agreement, the center provides the detainees with housing accommodations, food, clothing, routine medical and dental care, weekday classroom education, recreation, access to the provision of educational or religious services or food, clothing, and routine dental care, for example, or medical care. There's no question that the center is not providing those. Is that correct? Judge Wilkinson, I believe the correct answer is that there is no question that the center is providing those, at least for purposes of this case. There is no claim with regard to inadequacy with respect to any of those matters. Okay. Our position is that the statutory scheme governing ORR's custody of unaccompanied minor immigrant children, as well as the contractual provisions of the agreement between the Office of Refugee Resettlement and Shenandoah, both point to the conclusion that Shenandoah is more like the treatment facilities at issue in Youngberg and Patton, and less like the criminal detention facility involved in the Newbrow case, upon which the appellant and the court below largely relied. By statute, unaccompanied minor immigrant children are to be placed in the, quote, least restrictive setting, consistent with their best interests. They may not be designated for detention in a secure facility such as Shenandoah, absent a determination that the child poses a committed a crime. And here I would note that there does not seem to be any dispute that the unaccompanied minor immigrant children confined at Shenandoah, where they are due to behavioral issues, not as a result of criminal activity. The secure facility placement must be reviewed and reevaluated on a monthly basis to determine if such restrictive placement remains warranted. And finally, in any event, the facility must be, quote, capable of providing for the child's physical and mental wellbeing, unquote. The concern is that if a child is sent by ORR to Shenandoah, a secure facility, on the basis of mental health-related behavioral problems, and as Shenandoah contends, it essentially has no obligation to provide other than very basic mental health treatment, then the 30-day review and the prospect of a child in those circumstances being, quote, stepped down, unquote, to a less secure setting is pretty meaningless because if there's no treatment, there's no opportunity for the child to get better, and therefore, we contend that this is the treatment. Excuse me a second. You made a statement about there being no treatment, but as I understand it, that's not quite correct. I thought the record reflected the fact that there were two clinicians and a psychiatrist gave, in fact, gave treatment to Doe, and he was regularly seen by the clinicians at least once a week, and the clinicians, the mental health clinicians were, their names were Andrew Mayles and Evan R. Ailman, and both of them were licensed professional counselors. They both had a master's degree. They each completed 3,400 supervised clinical hours, and that wasn't all. He was receiving mental health treatment from Dr. Cain, who was an outside psychiatrist who visited the facility, and apparently met with Doe whenever he visited. Now, I understand you don't, you think that's not ideal, but to say that there's no mental health treatment when you have three different, two clinicians and a visiting psychiatrist, I realize you think that the visiting psychiatrist didn't meet with him long enough, but there is mental health treatment that seems to me so different from the payola. It may not be ideal from your point of view, but for a facility which isn't set up as a hospital, he's been doing pretty well. I mean, and they have, he's been able to, the clinicians, whenever he's wanted, he hasn't been cut off. There's a large number of visits with Dr. Cain, and actually, the mental health that he received by his own admission, his anger management improved while he was at the facility, and they, except for one incident, they kept him, for the most part, from self-inflicted harm. Medications were prescribed. All I'm saying is that if there was no mental health treatment, and if he was just being warehoused, that might have a stronger case, but here, where we have a situation where there's no question that some treatment was provided, and the matter is whether it's all that you think should be treated. Your Honor, if I may respond to that, there is a fundamental question here as to whether or not the mental health treatment provided, such as it was, was adequate, constitutionally adequate, as required by the Delonta case, et cetera, and the critical problem here is that the testimony and evidence provided by Shenandoah's own employees basically casts significant doubt on the adequacy of what they were doing. There isn't any question. Excuse me, Mr. Howard. This is Judge Keenan. Yes, ma'am. Mr. Howard, and I don't mean to cut off your answer so early in your response to Judge Wilkinson, but perhaps you could also frame your answer in the context that if we agree with you that the professional judgment standard under Youngberg should apply, isn't this a matter to be remanded to the district court in the first instance to go over the adequacy of treatment? Because the district court specifically excluded portions of Dr. Lewis's testimony. We don't even have a complete record in front of us. So I wonder whether the adequacy of the treatment, if we agree with you on the professional judgment standard, is something that necessarily needs to be considered on remand. So if you could take that into consideration when you're giving further answer to Judge Wilkinson. Yes, Judge Keenan, I'll try. Because we do believe that adequacy of the treatment such as it was is a question under either the professional judgment standard, which we contend should have been applied, or under the deliberate indifference standard. With respect to professional judgment, we do believe that the way in which Shenandoah was charged with functioning with respect to these unaccompanied minor immigrant children with regard to its obligations to provide adequate mental health care, both under the statute and under the contract, does indicate that it was functioning as a care provider, quote unquote, for purposes of these children, irrespective of its function in other contexts and capacities. The weekly individual counseling sessions, the group therapy sessions that were supposed to have been held, and the meetings with Dr. Kane, there are clear questions with regard to the adequacy, whether or not under the professional judgment standard, which we contend should be or without regard to a particular standard of care, just adequacy in the abstract, under circumstances in which the clinicians themselves said that they don't treat or even discuss trauma with children, that even when they're provided with specific treatment and directions or recommendations on a particular child from a psychological evaluation, that they do not provide... Counselor, excuse me, when you keep coming back to the adequacy of this and that, I have a question about the Youngberg standard is one that draws us maybe into adequacy, but more so than the deliberate indifference standard. So I understand why you want that standard. But the whole question of adequacy seems to commit us to a long-term institutional supervision of this facility. And the Supreme Court more and more has indicated that it's really not a proper function for federal courts, or it's a very sparing function for federal courts to be able to make informed assessments of these kinds of things. There's a limit to which we can play mental health clinicians, but I am concerned about the warnings from a standpoint of federalism and others of placing the federal courts in an institutional governance role and committing us to continued supervision of something in which we have limited expertise. And oftentimes the Youngberg standard has been applied in the case of an individual and individual circumstances. But here, DOE-IV is a named plaintiff, and this is brought in the context of a class action. And when you bring things in the context of a class action, then we are supposed to assume institution-wide responsibilities. And I wonder if we're not overstepping our appropriate role. Judge Wilkinson, I don't believe so. I believe that under the cases that this court has previously decided, including Delonta, Gay-Paola, et cetera, that constitutional adequacy of care is an element of a deliberate indifference analysis. And when the facility's own people, those who are actually providing the care, have expressed clear concerns about the adequacy of what they're doing in light of the needs of the children that they're purporting to care for, at a minimum, there are significant questions of fact that should have precluded the district court from finding as a matter of law that the mental health care was adequate. It would be one thing if... Mr. Howard? Yes, Judge Keenan. Excuse me, Mr. Howard. This is Judge Keenan. What jumps off the page at me as a giant hole in the district court's there is no discussion about the fact that these are children. And I haven't really heard you say a lot about the fact that these are children. You seem to be, if you'll forgive my saying so, jumping back and forth between professional judgment and deliberate indifference. But you haven't really, in my view, framed the discussion of the fact we're talking about children. And the fact that children, under the law, unless they're certified as adults, are not criminal. Their conduct is not criminal conduct unless they are certified as adults. And it seems to me that this has to make a difference in the analysis. Yet I haven't heard you say anything. The district court was silent on this. And what's your response? Judge Keenan, I absolutely agree with you that it is a critical element of the analysis here. Not only is this a non-punitive setting, but these are children. And even juvenile facilities that under a contract-type situation with ORR, as a general matter, are obligated to provide an environment that is care-oriented for children. We have addressed that significance quite at some length in our brief. And I apologize for not having that be a part of my presentation thus far. But unquestionably, one element of why we believe that professional judgment is the standard, not deliberate indifference, is that in addition to the statutory scheme in the contract, the fact is that the appellants that we're talking about are a class of children. Shenandoah itself, even apart from the statutory scheme in the contract, describes its mission as, quote, to provide an environment with an emphasis on continuing and expanding youth's education and providing proper physical and mental health services and support. I think that's a clear indication of its own recognition that it's dealing with children, not adults, and certainly not a punitive setting. What about juveniles in custody? Are juveniles in state custody provided the kind of mental health services that you wish? Your Honor, we contend that juveniles, irrespective of the circumstances, are entitled to trauma-informed care. You know, they're pretrial detainees, and they're also juveniles in state custody. And I'm wondering if those, as a routine matter, are given the kind of mental health treatment that you would prefer. They are, Your Honor, and we have cited a number of cases in our brief that both support the proposition that, not unanimously, but certainly the predominant number of cases that address the question of juveniles in the manner that you're describing, that determinations with regard to adequacy of care in those contexts are governed by professional judgment, not deliberate indifference. Well, I grant you that there's an obligation of humane treatment to anyone who's in custody of any kind. My question is, when you go beyond food, clothing, medical and dental care, and educational facilities, access to religious services, I don't understand why, when coupled with the things that you and I have just been over, why that isn't a perfectly sufficient treatment here. I mean, the DePaola case, this is so very different from DePaola, where they did absolutely nothing, and they warehoused somebody without having a clinician or a mental health professional ever seeing them. But this strikes me as very different, and I think you're asking for something more than juveniles in state custody receive. Your Honor, this would be a different case if not for the very clear statements of doubt on the part of Shenandoah's own clinicians with respect to the adequacy of the care that they're providing. If this case was like the Davis case relied upon by the athlete, in which there was no question that the care that the claimant received was adequate to the full extent that it was provided, but he was asking for more. Counsel, please. I have been in a lot of cases, school cases, in the Department of Justice and elsewhere, and it was almost inevitable in those cases that teachers or educators or officials or whatever, they would always or the education that we're providing is not adequate. The care we're giving is not adequate. And why do they testify in that way? Well, part of it is because they want more funding, and the quickest way to get more funding as a general matter is to say that what we're doing is not adequate. We need more. We need more. And there have been very few institutional cases where I haven't seen staff members and others saying we want more, we want more, we want additional funding in order to bring this up to the level of adequacy. I mean, that's just part of the dynamic of this. And I don't understand why you are catching such dispositive weight to it. Your Honor, I believe it deserves dispositive weight with respect to the grant of summary judgment because the district court concluded that the basic facts recited by Shenandoah, i.e. that they provide a clinical appointment with the child every week, that they provide some kind of group therapy, and that they see the psychiatrist when he periodically visits is constitutionally adequate care. When the testimony of Shenandoah's own people is that the clinical evaluations that take place on a weekly basis don't involve very much time, when the testimony is there really is no group therapy, notwithstanding the fact that it's contractually required, and when the testimony is, even from the psychiatrist, that he doesn't provide any, quote, talk therapy, and that he believed that the clinicians were the ones. Are you proceeding under a contractual claim or a constitutional claim? I'm not suggesting that this is a breach of contract action, Your Honor. What I am saying is that the contract provides some framework within which to evaluate the adequacy of the care, and the fact that even with respect to the minimal obligations that they have under the contract, those aren't being fulfilled. Certainly, it seems to me in the context... Are you seeking a trial on this, or are you seeking a remand for the district court to take additional evidence? What do you think? We don't believe that there needs to be additional evidence in order for the district court, if it had thoroughly and carefully reviewed the entire record, to conclude that there are genuine issues of material fact that are triable. Okay, so you're not asking for an immediate trial. You're asking for the district court to review the record, and to take such evidence the district court feels necessary. That would be in the district court's discretion, in your view. You're not asking for a trial. Your Honor, if the... You're asking for the district court to review the whole record, and to take additional evidence, if necessary. Your Honor, if the record is deemed by the district court on remand to sufficiently establish genuine issues of material fact that have to be resolved at trial, then, of course, we would be prepared to proceed to trial. Yes, but we don't know that the district court would conclude that. No, we don't. No, we don't, and we certainly have no objection, if the district court on remand concludes that on the basis of this court's analysis in remanding, that it's appropriate to reopen the record and take additional evidence as to the adequacy of the care, then that's what we would be prepared to do as well. We, I believe, are keeping our own time, and I just want to make sure that I'm not... I believe I'm up against my 15 minutes on opening. If the court has additional questions, I'm happy to answer them. Otherwise, I'll reserve my five for rebuttal. Thank you. Thank you, and good morning. May it please the court. The district court correctly determined that allegations that mental health care is not sufficiently trauma-informed did not establish a claim under the United States Constitution. During his first 10 months of placement at the Apley facility, which I refer to as the center, the plaintiff, John Doe 4, was evaluated by a psychologist, met with a psychiatrist on a dozen occasions, and met with a licensed professional counselor on at least 60 occasions. The district court's ruling should be affirmed for three conjunctive relief involving mental health treatment on behalf of a class of minors without their legal custodian being a party to the case. Secondly, the mental health services provided by the center exceed the deliberate indifference standard, which was correctly applied by the district court. And then third, even if the professional judgment standard applies, the mental health services exceed constitutional requirements. Starting with standing, Doe 4 has to show that his claim is likely to be redressed by a favorable decision in this case to have standing. The Office of Refugee Resettlement, which is referred to as ORR, was Doe 4's legal custodian during the time he was at the center, and they are the legal custodian for all members of the certified class. Additional medical and mental health services are found by any ruling in this case requiring additional mental health services because they're not a party. ORR could simply decline to provide the relief, or they could transfer class members to another facility that would not be subject to a court order to provide additional treatment. The center could not provide additional treatment ordered by the court or even agreed to by the parties in the absence of ORR approval. Why not? Excuse me, Mr. Bobkins. The problem I'm having with your standing argument is, why can't the center provide a greater level of treatment? Why would they have to get approval for a greater level of treatment rather than a lesser level of treatment? Despite the placement of a minor at the center, ORR retains the status as a legal custodian of all the minors, including Doe 4 and the class members. The treatment that's authorized under the cooperative agreement is routine medical and dental treatment along with appropriate mental health interventions when necessary. The testimony in the record establishes that unless there's an emergency, the center has to provide additional treatment, including any additional mental health treatment. Okay, and I think that argument might be persuasive as to why this court shouldn't adopt a trauma-informed approach, because that's a policy decision, arguably, and a decision that needs to be made between the legal custodian and the care facility. But with regard to the adoption of a professional judgment standard for a child detainee, why is that something that this court cannot address? Because Shenandoah Valley is the care provider under the contract with ORR, and there has to be a measurement of the adequacy of their adult detainees. It seems to me to be a really problematic square peg in a round hole. Why are you arguing against the professional judgment standard? What's wrong with that in the case of a child? Well, cases where a professional judgment standard had been applied to a minor have been based upon a finding of a treatment or rehabilitation objective. The deliberate indifference standard, it's not something that's been solely applied to convicted prisoners who are subject to different standards. Also to certain other detainees waiting for trial, I understand that. But with regard to children, what is your objection to the use of a professional judgment standard when they are the children are not in an ability or do not have an ability to defend themselves the way an adult might? And why isn't this more analogous to the involuntarily committed mental patient in patent? If you look at the patent case and the factors that are outlined there, the dispositive question I would submit is what's the overall purpose of the facility? DOE 4 in this case was not transferred to the center to receive additional or more intensive mental health treatment. He was transferred there due to safety concerns. He had had non-behavioral incidents, six of which were physical altercations and had been deemed to be a flight risk. So he was transferred to the facility due to safety purposes rather than analysis. That's really dispositive to a certain degree as to which standard applies. There are four patents, but there are four patent standards. Why is that one dispositive? That one really gets to the overall purpose of the facility and that relates to the first factor and then also the second, which is the nature of the confining facility. The center is not a psychiatric hospital or residential treatment facility. It's a detention center. They shouldn't be accepting people. They shouldn't be accepting children unless they can provide them adequate medical care, including mental health care. I just don't understand why there is such a resistance to applying a professional judgment standard. The professional judgment standard is still very hard to meet. There has to be substantial departure from accepted professional judgment. That's pretty hard to prove. I just don't understand why there's such a resistance and a desire to pigeonhole these children into a standard that is most often used for criminals. We agree that even if the professional judgment standard is applied, the district court's ruling was correct. Inquiry by court, even under the professional judgment standard, it's fairly limited. One thing I wanted to bring up with you is that my good colleague refers to them as children and sometimes when I think of children, I think of people before the age of 10. I think of them very sympathetically. This is a different kind of situation, it seems to me. We're talking about a minor who may be 16 years old and is in the facility to control a violent behavior. There's a long history of violent altercations and he's in that facility because less restrictive facilities simply would not accept him. You do clearly have something where it's not a mental health center. What you're trying to do is bring about some sort of behavioral modification. And they seem to have succeeded in that area. I agree with Judge Keenan that the professional judgment standard under Youngberg is a very difficult one to meet. And that's why it seems to me that what is provided here would suffice under either standard and I'm not sure that we have to decide at this point whether there's a deliberate and different standard or whether Youngberg applies. I don't understand that it makes that difference. But what else were they supposed to do? They prescribed all kinds of medications. He was regularly seen by clinicians. They succeeded in keeping him from self-harm. They succeeded in having his anger management improved by his own admission. He had made progress at this facility by his own admission. He said, I was able to meet with either Dr. Kane or the clinicians whenever I wanted. Of course, it's never enough. But the center had succeeded by his own admission in several ways procedurally in providing him unfettered access to the three people, Dr. Kane and the two clinicians. Unfettered access to those three people. And not only was there unfettered access, but there was a success achieved in the particular mission and purpose of the institution they were left with an individual whom no other facility would accept. And they produced results. Thankfully and happily, they didn't make an ideal situation of it, but they made what was clearly progress. And they succeeded where other institutions did not. And to take an institution that was designed to try to control anger management situations and did in fact do that, and which did in fact provide not the highest level of ideal mental health care, but as Judge Cannon points out, the Youngberg standard is actually very differential. And I just, this institution deserved one heck of a lot more credit. And it's being given for what it did and for what it accomplished. And so, you can continue, if that's fair. Yes. Thank you, Judge. Yes, that gets to our position in that the reason that DOE-IV was transferred from a left secure facility to the center was to address safety concerns. And then have to do with his need for mental health. Because you're bringing up, you're almost bringing up sort of a culpability to think, oh yeah, well, he was there because he was a problem. He was there because of security. Yes, we know that. But the point is, let me ask you this, what's the point? Do you agree that it is undisputed that these children suffer from trauma, severe trauma, mental trauma? You can see that. Your Honor, there is evidence in the record that many of the children that are in the center's care have experienced trauma. Yes, sir. Okay. Well then, if you're going to do something about that from a medical standpoint, don't you think you have to address the trauma? Well, there's, that's not, let me answer both parts of that question. I mentioned the reason for DOE-IV's transfer not as a means of tarnishing him or establishing culpability. I do so only for the purpose of the patent factors, which look at the reason for the confinement of the claimant and the nature of the facility. All right. Point taken. Point taken. Now, address the second part. Okay. The contention that trauma is not treated at the center, that is based upon testimony that was given by a mental health clinician in this case in the context of a one minor who was not DOE-IV who had just returned from a weeks-long hospitalization for psychiatric issues. The clinician testified that she chose not to dig up and treat the trauma in the context of her first clinical interaction with that individual. The record, and even DOE-IV's expert, Dr. Lewis, shows that the center has trauma-informed principles in the approach that it takes. Dr. Lewis, DOE-IV's expert... And the record shows that the recommendations made by that sort of trial group, a lot of them were not implemented. Correct? Is that in the gave a recommendation that he be transferred to a residential treatment facility. The center attempted to transfer him to several different facilities on a couple of different occasions. There were two impediments to that. The first is that since they're not the legal custodian, the center couldn't authorize it without ORR approval. And secondly, and more importantly, there was no facility of that type that was willing to accept DOE-IV due to the risk that his behavior posed in a less secure setting. Yeah, but you're not addressing in terms of... Are you suggesting that he's the only child there that has trauma, past trauma problems? The country they've come from, the journey they made to get here? You're suggesting it's isolated to DOE-IV? No, I'm not suggesting that. What I would point to is the basis of the district court's ruling was that DOE-IV failed to establish an individual claim for insufficient mental health treatment. So I think in the scope of review on appeal, that's the ruling that's being reviewed. I think it's fairly settled to the law that DOE-IV has to he can look to facts and allegations concerning other members of the class when bringing them an appeal. But Mr. Botkin, doesn't the district court have to address the fact that we're dealing with a child because that is a legal disability, similar to that of a comity or someone else who is in a protected status? So how can we accept the deliberate indifference analysis that doesn't even acknowledge we're dealing with a child? And they aren't all 16-year-olds. They can be as young as, what, 10, 11 in those facilities. I mean, it just seems to me that you'd be doing more good for the system if we just let the district court analyze this under professional judgment in the context of a child. It's still going to be a difficult standard to meet, but it'll be a protection in place for a person under a legal disability, which a child is. Even if the district court were to apply the professional judgment standard, is it their position that that wouldn't change the outcome in this case? Professional judgment standard... I understand that. Yeah. And if DOE's got a weak case, then the district court can say, okay, I'm applying the Youngberg standard. It's not a giving standard. There has to be a substantial departure from professional judgment, and I just don't see that there. And then the case can be dismissed, but the district court would have considered it under a different standard and in the context of this being a child. What's wrong with that? Well, if the district court is going to reach the same opinion, and that opinion is supported by a level of fact that's relatively undisputed in the record, then it seems to me there wouldn't be a point to address the standard if it's not going to change the outcome. Aren't you forgetting the evidence that we didn't permit on professional judgment, part of Dr. Lewis, Dr. Wiseman? You can't get a clock right now. Go ahead. But there was several evidence that was based upon professional judgment that the court would not allow. It didn't consider. Well, the court excluded Dr. Lewis's testimony on two grounds. The most important of those grounds was the fact that he was giving opinions based on a higher standard and higher level of care than the constitution required as the district court saw it. Well, who knows what the constitution requires? You keep saying that the constitution requires like lays out some physician death manual. It doesn't. It talks about what is inadequate in terms of addressing present and demonstrable needs. If it's inadequate, that is unconstitutional in terms of deliberate indifference to a standard that's known. He didn't allow the doctor to talk about what the standards were. How are you going to know whether or not you're indifferent to a professional standard when you don't allow the evidence as to what the standard is? So you can't just go back and say, well, we don't need to go back because this was enough to address that. We don't know because the evidence was cut off. Dr. Lewis's opinions included testimony that the center assesses for trauma and intake. Diagnosis trauma, provides training in trauma informed care. He also testified that the mental health clinicians made efforts to go forward but didn't go far enough. His testimony shows that this is a dispute over the extent to which these services were based on a trauma informed approach and as opposed to a disagreement that should be constitutionally actionable under either of the standards. Thank you. All right. Mr. Howard. Yes. Thank you, Chief Judge Gregory. Just briefly, the fact that DOE 4 was transferred to Shenandoah as a result of some pretty significant behavioral problems kind of assumes the conclusion in that his behavioral problems are attributable to the fact that he suffered trauma. I mean, it's certainly not usual for a 16 year old or 17 when he got there to be diagnosed with post-traumatic stress syndrome. And there's a those circumstances where the facility knows that it's receiving children that have undergone trauma and its clinicians concede that behavioral issues are attributable to the fact that they've undergone trauma. For the facility to determine, well, we're not going to address trauma, we're not going to treat it. We're going to basically ignore it and just pretend that all we have to do is tell these kids how to behave and hope for the best. That is essentially what this record reflects and therefore respectfully disagree with Judge Wilkinson because some part of the testimony that the district court strangely concluded could be excluded from Dr. Lewis was that not only was the treatment that DOE 4 received inadequate to his needs, but in fact, the overall course of conduct of the facility towards DOE 4 re-traumatized or aggravated his trauma rather than helped it. What evidence is there of that? There are Dr. Lewis's opinions, which the district court declined to consider because she said she was granting summary judgment in the absence of her reviewing this. Was there any prohibition when DOE 4 met with Dr. Kane or with the two professional counselors, the mental health clinicians? Was there any limit placed on what could be discussed? Could the post-traumatic stress syndrome be discussed with the clinicians? Could it be discussed with Dr. Kane? It could have been, Your Honor, but the fact is that the clinicians say they are really not qualified to treat post-traumatic stress syndrome. Dr. Kane testified that he only really talks with the kids about their medications and the impact that the medications are having on them. The clinicians also said that it was their understanding that Dr. Kane does not speak to. One thing that concerns me is you try to draw the strict line between behavioral improvement on the one hand and treatment of the underlying trauma on the other, but they are not totally separate and independent matters because professionally, and you know as someone with a good background in this field, you know this to be correct, is that one of the ways in which you treat post-traumatic trauma is with medication, which he was given, but also through behavior modification. By encouraging someone in more constructive modes of behavior, you are in fact dealing with underlying trauma issues. If you can reduce the number of violent outbursts, which they did, you are in fact treating the trauma. We have been having this whole discussion as though the behavioral modification and trauma treatment were as different as night and day, and they are not at all. They are related, and I think a great many distinguished mental health professionals would indicate that one of the ways, one of the chief ways you can help someone overcome any kind of trauma or stress is by channeling behavior in a constructive fashion. Sometimes the way you behave on the outside affects your self-respect and self-regard internally. You can't just build a wall between external conduct and internal self-esteem because when your anger management improves and your behavior and your conduct improves, then people start responding to you in a more open and welcoming and positive way. You must know this because you have a good background in this area that when you have behavioral modification, it just affects your whole surroundings and the way that you interact with everyone with whom you come into daily contact. When you interact positively with people, you are addressing post-traumatic stress. Your Honor, respectfully, I would say that what you just said, which I don't necessarily disagree with in the abstract, really goes to the question of the adequacy of the mental health care that DOFOR received. There are facts in dispute with regard to that adequacy, which compel the court to reverse the summary judgment and remand this matter for further proceedings. Thank you. Thank you, Mr. Hollis. Thank you, Mr. Botkins, for your argument. We can't reach you in a normal fashion of shaking your hand, but know that nonetheless, we are very appreciative and respect your good arguments and thank you so much. I wish you safety and wellness. Thank you so much. Wish you the same, Your Honor. Thank you very much. Thank you. The court will take a brief break before hearing the next case.
judges: Roger L. Gregory, J. Harvie Wilkinson III, Barbara Milano Keenan